UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :
                              :
                              :
                              :    NO. 3:CV-03-032
        -vs-                  :
                              :    (Judge Kosik)
                              :
CHARLES SECHLER,              :
                              :
              Defendant       :


## MEMORANDUM

We have before us a defense motion to suppress physical evidence seized during January 11, 2003 searches and any statements made by defendant Charles Sechler during the searches.

On January 11, 2003, the Pennsylvania State Police conducted searches for financial records and related instruments following a drug investigation of a drug organization involving Sechler which commenced in 2000. The searches were based on two separate warrants on the residence of Charles Sechler at 705 Carey Hill Road, Montoursville, Pennsylvania, and a property owned by Sechler's father and rented by the defendant at 5958 Route 864, Mountoursville. The warrants were issued on January 10, 2003 by President Judge Kenneth D. Brown of Lycoming County and were supported by two identical affidavits of probable cause prepared by two experienced state police officers specially trained in drug investigations and financial transactions related to drug activities. The purpose was to conduct a source and application of

funds analysis/investigation of Charles Sechler and a Lamar Ploppert.  The motion to suppress is also directed at a third search, which the defense characterizes as an "ex post facto search," authorized on January 11, 2003 by a state district magistrate on the father's property.  The latter search resulted when the officers were executing the records search on the father's property and came upon in plain view evidence of various items indicative of a marijuana manufacturing and growing operation , the seizure of which was not authorized by the financial records search warrant.

The motion to suppress statements of Sechler after his arrest resulted from conversations during one of the searches when he claims he did not knowingly waive his _Miranda_ rights.

<u>Background</u>

On February 11, 2003, a drug conspiracy indictment was returned against a number of individuals other than defendant Sechler.  On March 25, 2003, a superseding indictment was returned adding individuals other than Sechler.  Between May and July, 2003, six charged defendants entered guilty pleas.  Thereafter a second superseding indictment was filed on June 17, 2003 adding Sechler.  Finally, a third superseding indictment was filed adding Steven Fausnaught to the drug conspiracy with Sechler.

Between September 18, 2003 and September 7, 2004, the defense filed fourteen motions to extend the time for filing pre-trial motions.  On October 7, 2004, Sechler filed a motion to sever and to suppress his statements.  The motions were briefed and a

suppression hearing was scheduled for November 11, 2004.  Between November 5, 2004 and July 12, 2005, Sechler filed eight motions to continue the suppression hearing.

In July, 2003, Sechler hired private counsel who shortly withdrew because he was not paid.  The court appointed a public defender who left the public defender's office in October, 2004. Accordingly, another public defender was appointed.  Sechler felt this counsel had a conflict of interest, and sought to have the court appoint a lawyer of his choosing.  This was refused.  On October 11, 2005, we appointed Sechler's present counsel from a panel of lawyers.  Present counsel was specifically selected because of her experience as a zealous defender.  Although the time for motions had expired, present counsel filed some fourteen pre-trial motions on November 14, 2005, including the present motion to suppress.

In her brief, present counsel acknowledges that extensive discovery has been provided and that she was allowed to confer with Sechler's co-conspirators.  On January 31, 2006, the court authorized additional funds which authorized a total of $4,200 for a private investigator to interview co-defendants, expected government witnesses, as well as the defendant, in preparation for the suppression hearing.  This was subsequently increased another $1,648.

-3-

Discussion and Conclusion

Defendant Sechler seeks to suppress the evidence acquired in all the searches, as well as any statements made by the defendant for numerous reasons.

1.   The identical affidavits in support of the search warrants issued on January 10, 2003 and executed on January 11, 2003 on the properties located at either location (705 Carey Hill Road or 5958 Route 864) failed to set forth facts which would allow a neutral and detached judge to conclude that there was probable cause to believe illegal conduct at either location. Specifically, the defense maintains the information in the affidavits was stale and mostly based on information from multiple sources, including named individuals of unproved reliability.

2.   The two search warrants were unconstitutionally overbroad and amounted to general warrants in that they failed to specify with sufficient particularity the things to be seized.

3.   The affidavits for a search of the two properties on January 11, 2003 contain statements by both affiants which intentionally or with reckless disregard for the truth were false and therefore materially affected probable cause.   The intentional falsities related primarily to statements in the affidavits attributable to a Timothy Moore, Lamar Ploppert and a Robert Levan.

4.   The third affidavit for the search warrant issued on January 11, 2003 styled the "ex post facto search" lacked independent probable cause as well as constitutional substance in that it was based on the "fruit of the initial warrant," i.e., evidence discovered in the earlier two defective searches, and further failed to indicate the drug training qualification of the canine accompanying the search.

5.   Any statements made by defendant Sechler, after his arrest, were involuntary and made in violation of *Miranda v. Arizona*, 384 U.S. 346 (1966).

6.   The defense next claims the executing officers violated the defendant's right to privacy by entering the various structures without proper notice and before the occupants could voluntarily surrender the premises.

A hearing was held on the suppression motion on March 21 and 22, 2006.  In addition, the court held a hearing on the defendant's request under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978).  In support of the latter, the defense submitted its offer of proof, Exhibit "E" to their suppression motion.

I.

The affidavit of probable cause for the first two searches on January 11, 2003 was sworn to by Trooper R.S. Burcher, Pennsylvania State Police, serving with a Vice Narcotics Unit, and Trooper A.E. Diaz, serving with a Tactical Narcotics Team.  The affidavit lists their extensive experience in narcotics investigations.  Trooper

Diaz was serving in a specialized position of Financial Investigator/Asset Forfeiture Officer after having completed training concerning financial investigative techniques and money laundering from the FBI, Internal Revenue Service, and both Federal and State offices of the Attorney General.  The items to be searched for did not include drugs. The search was for records of drug trafficking, including travels, computers, communication facilities, telephone records, property acquisition and firearms used to safeguard drug transactions.

The affidavit consists of forty-nine pages and ninety-one paragraphs.  It represents that confidential informants were utilized, and that they have proven their reliability through cooperation with the Pennsylvania State Police by providing verifiable intelligence and making statements against their own penal interest.  The affidavit describes that the source and application of funds analysis intended from the records involved defendants Sechler, a Steven Fausnaught, and Lamar Ploppert, and that the premises to be searched contained pertinent records ordinarily required and maintained in large-scale drug trafficking. The persons associated with Sechler were identified as persons with prior arrests and convictions for drug-related offenses.

The affidavit of probable cause states that the investigation of drug trafficking in Central Pennsylvania commenced in the Fall of 2000.  At the time, the main source for drugs identified before a Statewide Investigating Grand Jury was Timothy Moore.  Through further investigation, including statements of Moore and his

girlfriend, Sechler was identified as a bi-weekly supplier of methamphetamine and marijuana. In the Fall of 2001, search warrants on several properties utilized by Moore corroborated the information attributable to Moore concerning Sechler as his source. Attempts at Moore's cooperation failed.

In the latter part of 2001, the FBI identified a Robert Levan who was associated with Sechler. He was arrested in 2002 and agreed to cooperate. On November 7, 2002, he made a federal proffer in which he said he attended school with Sechler. He disclosed Sechler's association with his cousin Fausnaught and a Michael Stewart. They both had previously trafficked in large amounts of marijuana. Sechler had other associates who jointly acquired drugs routinely from California in large quantities and transported them to Pennsylvania. In earlier years, Levan transported drugs from houses at Sechler's direction.

In early 2000, Levan was present in Sechler's home when Sechler fronted large quantities of marijuana to Levan, Timothy Moore and Lamar Ploppert. Sechler routinely utilized pay phones, calling cards and pre-paid cell phones. At one point in 2001, these records were requested from telephone facilities. In January 2002, a federal Application for Pen Register was activated.

The investigation disclosed that in 2001 and 2002, Sechler engaged in numerous financial and property transactions, the records of which were subpoenaed by a federal grand jury. The affiants called some transactions as "structuring." Affiants believe a drug relationship as there is no documented or financial

information of legitimate income.  The Pen Register information analysis showed communications between Sechler and individuals known or identified as being associated with distribution of controlled substances.

During the latter part of 2002, Fausnaught was involved in controlled transactions of drugs totaling in excess of $30,000.  In the same period, there was constant communication between Fausnaught and Sechler disclosed by the Pen Register.  Surveillance also disclosed nocturnal activity in the vicinity of Fausnaught's residence and that of Sechler.  At times, it involved loading and unloading of an unspecified nature, including weapons.

The affidavit relates that on December 16, 2002, a sealed search warrant was approved by Judge Brown of Lycoming County for the residence of Ploppert.  The warrant was intended to find financial documentation.  Ploppert was served on December 17, 2002. Ploppert's cooperation was elicited and accepted because he had previously cooperated after being arrested and was found reliable and useful in an investigation.  Ploppert related his relationship with Sechler, Fausnaught, and Levan.  While in college with Sechler, he independently trafficked in marijuana as did Sechler. He knew Sechler made runs for drugs to New York City, and often swapped products with Ploppert.  After a hiatus in the relationship, it was renewed.  Sechler was always a source.  He told the authorities of the Fausnaught-Sechler connection and that their drug activities were their sole source of income.  Sechler bought a house which he put in his father's name.  Affiants claim

-8-

Sechler visited frequently.  The last time Ploppert claims to have purchased marijuana from Sechler was in the late Spring or early Summer of 2002.  In October 2002, Sechler told him that he was aware that he was being watched by the "Feds."  Ploppert was reluctant in his cooperation because of his concern for his safety.

On January 2, 2003, affiants learned that Stewart, an associate of Sechler, was stopped in the State of Texas and found to be in possession of 40 pounds of suspected marijuana.  The Texas authorities said he was on his way to Pennsylvania.  Stewart refused to make any statements.

The defense claims probable cause is lacking for the first two searches because the information was stale, and mostly based on information from multiple sources of unproved reliability. Further, that the warrants were overbroad and amounted to a general warrant lacking in specificity and particularity.  We must disagree.  A similar claim was made in several cases cited by the government which parallel at least the issue of staleness and the deficiencies of a general warrant.  *United States v. Abboud*, 438 F.3d 554, 573-74 (6th Cir. 2006); *United States v. $92,422.57*, 307 F.3d 137, 148 (3d Cir. 2002), and *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997).  These cases generally hold that the continuous and ongoing nature of the illegal activity is a sufficient answer to staleness.  Our indictment states that the conspiracy began in or about December 1995 and continued to the present, i.e., August of 2003, when the third superseding indictment was filed.  The overt acts relate consistent illegal

activity until January 11, 2003.  The affidavit of probable cause similarly relates the same path of activity to at least January 2, 2003.  In the cited cases, the time between continuous illegal activity and the application for a warrant extended between 11 months to years.  The basic holding being that when an activity is of a protracted and continuous nature, the passage of time becomes less significant.  Also significant in the cited cases is the search of records dealing with the illegal activity.  These records were created for the very purpose of preservation as is similarly related in our affidavit of probable cause.  Probable cause can be, and often is, inferred by considering the type of crime, the nature of items sought and the opportunity for concealment.  The warrants in our case were essentially for books, records and indicia of business activity one would expect in an extensive, longstanding, organized and well concealed criminal drug conspiracy.  While more extensive in our case, the warrant described in inclusive generic terms what is to be seized, as the court concluded in the _$92,422.57_ case where similar records were sought and seized.  The warrant did not vest the executing officers with unbridled discretion.  Nor can we lose sight of the fact that the purpose of this search was not for drugs but only for records to conduct a source and application of funds analysis.

We next consider the defense assertion that the information in the affidavits in the first two searches were based on information from sources of unproved reliability.  Although defense counsel is a most astute practitioner, this claim is somewhat specious rather

than substantive.  The affidavit clearly represents that its confidential sources were reliable because means were employed to test the reliability.  In more than one instance matters were done under police supervision.  In the case of Ploppert, a subject of the investigation itself, his reliability was based on previous cooperation and reliability.  Most, if not all, cooperating witnesses made declarations against their penal interest.  Much information was based on matter produced before a grand jury, Pen Registers and police surveillance connecting the defendants to each other.

Absent other alleged deficiencies in the affidavit and events we are about to consider, we see no basis for suppressing the search because the affidavit was in no way deficient.

## II.

Next, the defense claims the search of the first two properties should be suppressed because both police affiants representations in the affidavit of probable cause intentionally made false statements with reckless disregard for the truth with regard to statements attributable to a Timothy Moore, Lamar Ploppert, Robert Levan and others. As noted earlier, a hearing was requested and held in conjunction with the motion to suppress to allow consideration of the defense assertions under _Franks v. Delaware_, _supra_, in order to sustain their burden of proof.

Under the _Franks_ decision, "where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause . . ." a hearing is to be held. "In the event that at the hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause – the search warrant must be voided . . .". 98 S.Ct. 2676. The Supreme Court went on to note that an affidavit of probable cause must be based on a truthful showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay as well as information within the affiants' own knowledge that sometimes must be garnered hastily. *Franks* at 2686.

The gist of the preliminary showing of falsity by the affiants is contained in Exhibit "E" to the defense motion to suppress as "Offer of Proof." To briefly summarize, we note:

(a) The defense claims that in Paragraphs 9 through 13, an affiant asserts that after his arrest a Timothy Moore and his girlfriend implicated Sechler as his drug supplier. The affidavit then asserts that several search warrants were served on various properties utilized by Moore in investigating his care, and that information from the warrants corroborated Moore. The defense argues that "the affidavit" in support of the Moore searches did not mention Sechler and indicated a different source for his drugs. This information was deliberately kept from the issuing judge.

At the hearing, the defense called both affiant officers on direct examination. Trooper Burcher, the source of the Moore representations in the affidavit to search Moore's property and his oral statements implicating Sechler as his supplier, testified the information was given to him by a Corporal McGump of the State Police. Burcher knew nothing of the disparity.

(b) Next, the defense claims that in Paragraphs 14 through 18 of the affidavit it asserts that after Moore's unrelated drug arrest in 2000, the FBI identified a Robert Levan who was also arrested, and that he, too, implicated Sechler who allegedly orchestrated trips for Levan to obtain drugs for him, and that Sechler fronted large amounts of marijuana to Levan. The defense claims Levan lied, and the affiants should have known this fact. Similarly, the defense claims in Paragraphs 29 through 30 that Pen Register records of calls between Sechler and Ploppert, Fausnaught and Stewart could not have corroborated Levan's statements about Sechler's association with these persons because Levan lied. At the hearing, the defense called Levan as a witness to refute these matters but he exercised his counseled privilege against self incrimination.

(c) The defense next cites Paragraphs 31 through 40 which deal with information gathered on Lamar Ploppert. Paragraphs 41 through 44 describe a tenuous relationship of Sechler and an Edward Hartz. Thereafter, numerous paragraphs are cited in which alleged co-conspirators either sold drugs or associated with one another, but any relationship with Sechler was presumed because Sechler may have

spoken to them by phone or in person.  In other instances, for example in Paragraph 87 of the affidavit, the affiants claim they were informed that Michael Stewart was arrested for transporting drugs en route to Pennsylvania.  However, there is lacking any connection or presence with Sechler.

To sustain their burden of proof as to any falsity on the part of affiants, the defense examined both affiants without sustaining that burden.  The defense called Levan who, as we noted earlier, exercised his privilege against self-incrimination.  The defense also called Timothy Moore, who when examined by the defense on direct, corroborated statements attributed to him in the affidavit, i.e., that Sechler was his source for drugs; that he took pounds of methamphetamine from Sechler on a weekly to bi-weekly basis, and that when he was arrested he made the statements attributed to him. Moore further acknowledged that thereafter he refused to cooperate with the police.

The defense next called Lamar Ploppert.  On direct, he examined the affidavit with respect to the statements attributed to him.  He admitted knowing Sechler, Levan and a Young; he attended college with Sechler, and in college he trafficked in marijuana, but was not aware Sechler did so.  Later, he could not remember if he told this to Diaz who arrested him.  He did say Fausnaught made runs to New York for drugs, but could not remember if he mentioned Sechler.  He expressed lack of memory in implicating Sechler.

Ploppert recalled telling the affiants that Fausnaught and Levan had been arrested for possibly cultivating marijuana.  He

-14-

"might have said" -- and "probably" did say that Fausnaught and Sechler made comments that made him believe they would use violence to intimidate foes and protect their organization, having noted earlier that they had weapons. He "might" have told affiants that he believed Sechler would rather kill somebody or himself than be arrested. Ploppert acknowledged that in a conversation with Sechler he asked if Sechler was still trafficking.

On cross-examination by the prosecutor, Ploppert said he honestly did not remember the things he told the officers. He did acknowledge being asked to facilitate a call to Sechler to purchase drugs. He refused though he did agree to cooperate. He admits telling the affiants that he did not trust Sechler or Fausnaught and believed that if they found out about his cooperation he and his family would be subject to retaliation. He was concerned for his two-year-old daughter.

In rebuttal to the defense _Franks_ claims, affiants Trooper Diaz and Trooper Burcher testified that they were present during a search and subsequent interview of Lamar Ploppert in December 2003 concerning matters the affiants included in the affidavit of probable cause and which the defense sought to label as deliberately false. Those matters were refereed to in Paragraphs 77 through 86 of the probable cause affidavit.

Burcher testified that the interview of Ploppert did indeed include all the matters attributable to him in the affidavit; some which Ploppert denied or could not recall at the hearing. The government offered its Exhibit "5" which is a contemporaneous

report of that interview dated December 18, 2002.  Exhibit "6" was offered as evidence that Ploppert agreed to become a confidential informant, a procedure which needs to and was approved by a senior deputy attorney general in Pennsylvania.

After reviewing the "Offer of Proof" submitted by the defense in relation to the evidence offered at the _Franks_ hearing, we conclude that the defense has not sustained its burden of proof. While every fact in the affidavit may not be correct, the deficiencies are minor, and in part based on the credibility of some witnesses which will remain for the trial.  The affidavit is sufficient to have established probable cause for the warrants to search.

III.

During the first two searches, the police found in plain view various items indicative of a marijuana growing operation which was not an authorized subject of the search warrants.  This resulted in the affiants seeking the third search warrant styled by the defense as the "ex post facto" warrant.

The defense argues that the results of this search should be suppressed, first, because it lacked independent probable cause or represented the "fruit of the initial warrants" which lacked probable cause; second, because the items sought in the initial search warrant were discovered by a drug trained canine accompanying the first two searches as well as the third search. The later argument is premised on the failure to include in any of the probable cause affidavits the qualification of the canine.

-16-

As to the first argument, we deem it to be moot because we have concluded that there was probable cause for the first two searches.  Accordingly, the affidavit for the third search was not an outgrowth of any illegal search.  The second argument is meritless because the drug paraphernalia was found to be in plain view during one of the first two searches.  The third search for these same items, to wit, an exhaust fan, temperature and humidity controls, potting soil and large Rubbermaid tubs, was based on the drug enforcement agent's identification of them as drug paraphernalia utilized in an indoor marijuana growing operation. There was some evidence that the dog detected marijuana on the Rubbermaid tubs and possibly the fan as well.  However, this alert was in addition to the items being identified in plain view and found to be drug related instruments based on the officer's experience in drug-related investigations.  This was the testimony of the probable cause affiant for the third warrant.

While the canine qualifications was a deficiency in the affidavit for the third search warrant, the canine's role was simply confirming what the affidavit already concluded about the paraphernalia in plain view.  Moreover, since the police were lawfully searching the properties in the first two searches, the drug paraphernalia observed in plain view during that initial search could have been seized without a warrant.  _United States v. Menon_, 24 F.3d 550, 559 (3d Cir. 1994).

-17-

IV.

Finally, the defense seeks to suppress any statements made by Sechler after his arrest because they were made involuntarily and in violation of his constitutional rights.

At the suppression hearing, the defense offered no evidence on this issue.  The only evidence came from Trooper Burcher who stated that he had a brief conversation with Sechler some time after the search commenced.  After the defendant was briefly detained for security reasons at the beginning of the 6:00 a.m. search, the defendant elected to continue his presence.  Burcher told him he was not under arrest and free to go.  In trying to dispel any notion that Sechler was detained, the officer offered to accompany him to his car.  The search lasted ten hours.  During this time, Sechler asked more questions than the police.  He was not *Mirandized* and would have no reason to ask for a lawyer.  Any statements by Sechler were memorialized in a police report, Exhibit "7."  It reflects what the officers testified to above.  It notes that the conversation consisted of small talk.  The most possible inculpatory statements was that he had not worked for about a year because he had no time to do so.  He did state that his mother assisted him financially.

We find no factual or legal basis in what transpired at the hearing to suppress conversations reported in Exhibit "7."

V.

Finally, we address the last issue raised by the defense claiming the officers, in executing the search warrant, violated

the defendant's right to privacy by entering his various structures without proper notice, i.e., referring to the common law knock-and-announce principal. *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914 (1995).

On this issue, the defense offered no evidence. Trooper Michael Hutson testified that he was in the lead vehicle for the 6:00 a.m. search at Sechler's house. He pulled past the front door in a marked police vehicle. He activated his overhead lights and engaged his PA system announcing, "State Police search warrant." At some point, an emergency team was assembling on the front porch. He continued to announce the search notice for about two minutes until he was notified the residence had been secured. An emergency team was used because surveillance disclosed Sechler possessed weapons. When the announcement did not work, the police entered with a battering ram.[1]

The *Wilson* case in discussing the knock-and-announce rule made it clear that every entry need not be preceded by an announcement. The presumption in favor of announcement would yield under circumstances presenting a threat of violence. We believe this is an appropriate case to justify the means of announcing the presence of the police and the reason for their presence. In the circumstances, the manner of entry was appropriate.

---

[1]While not alluded to in Hutson's testimony, we note that earlier the testimony of Lamar Ploppert acknowledged that Sechler told him that he would rather kill than be arrested.

-19-

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA   :
             :
             :
             :  NO. 3:CV-03-032
    -vs-       :
             :  (Judge Kosik)
             :
CHARLES SECHLER,      :
             :
      Defendant  :


## **ORDER**

_____

   AND NOW, this 9th day of August, 2006, IT IS HEREBY ORDERED
THAT the defense motion to suppress the search and statements of
the defendant is **DENIED.**


          s/Edwin M. Kosik
          United States District Judge